**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

Dwayne Smith,

                 Plaintiff,

     v.

Nancy A. Berryhill,
Acting Commissioner of Social
Security,

               Defendant.

No. 3:18-cv-228

(Judge Richard P. Conaboy)

---

**MEMORANDUM**

**I.  Procedural Background.**

We consider here Plaintiff Dwayne Smith's appeal from an adverse decision of the Social Security Administration ("SSA" or "Agency") on his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff's applications were denied at the administrative level whereupon he requested a hearing before an administrative law judge ("ALJ"). He received that hearing on May 13, 2014 before ALJ Daniel Myers. On August 1, 2014, the ALJ issued a Notice of Decision that rejected Plaintiff's claims. Plaintiff asked the Appeals Council to review the ALJ's decision and the ALJ denied review by Notice of Action dated August 19, 2015. After appealing to this Court from the Appeals Council's decision,

this case was remanded to the Agency for further action on January 17, 2017.[1]

After remand, Plaintiff was afforded an additional hearing on June 30, 2017 before ALJ Daniel Rubini. On November 13, 2017 ALJ Rubini issued an unfavorable decision. Plaintiff then filed this action over which this Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c).[2]

## II. Testimony before the ALJ.

ALJ Daniel Rubini conducted a hearing in this matter on June 30, 2017. Present were Plaintiff and his attorney along with Andrew Caparelli, a vocational expert ("VE"). The testimony may be summarized as follows.

Plaintiff stated that his condition had deteriorated since his previous hearing before ALJ Myers in 2014. The more he tries to do the more his pain increases. He takes prescription strength Ibuprofen along with Advil or Aleve for his pain. He describes his pain as fluctuating in intensity but constant. Sometimes reclining on an ice pack alternated with a heating pad helps to alleviate the pain. (R. 976-978).

---

[1] Civil No. 3:15 cv 2028, Doc. 28.

[2] Defendant's contention that Plaintiff abandoned his DIB claim (See Doc. 11 at 4, n.1) is plainly erroneous as the document that allegedly supports this notion (R. at 1272) refers to a claimant other that the Plaintiff in this case.

Plaintiff normally awakens about 10:00 a.m. and goes to bed about 11:00 p.m. It typically takes him about three hours to fall asleep because of pain and anxiety about paying his bills. He wakes up from time to time and does not feel rested in the morning. He takes three naps of approximately one hour duration each day due to exhaustion. He lives alone and chores which he could formerly do in a short time now take him much longer to complete. (R. 978-980).

He attends Harrisburg Area Community College ("HACC"). He is trying to earn an associate degree in event promotion and music production. He currently does not have a vehicle and hopes that by the time the next semester convenes he will have an operable vehicle. He takes two or three courses each semester. His cumulative grade point average is approximately 3.18. When school is in session he is in class approximately five hours each week but additional studying and work on projects combine to fill much of his time six days each week. On the one day that he does not allocate time for school activities he tries to mow the grass, get his dishes done, and go to the laundromat. He lives alone in a mobile home. (R. at 980-985).

In response to questioning by his attorney, Plaintiff indicated that he had disciplinary problems on three occasions at HACC which resulted in Plaintiff being placed on probation. His probationary period is now completed. He is currently

involved with the Office of Vocational Rehabilitation ("OVR"). OVR had helped him obtain a CDL Class Driver's License in 2007 after he was injured on a job. He still has the CDL designation but does not know whether he wants to keep it because he does not think he will be able to handle a truck driving job. (R. 985-988).

Plaintiff discussed seeing a Doctor DiPrima to "get to the root" of his problems working with people. He confessed to difficulty getting along with his professors and to having been fired from various unspecified jobs for "being disrespectful". He has four friends that he sees on a regular basis and he states that he "somewhat" gets along with them. These relationships are based upon providing various types of help to each other. (R. 988-990).

Plaintiff receives an accommodation at HACC such that he is afforded extra time to complete tests. Plaintiff stated that at times he can concentrate for up to twenty minutes and at other times he loses concentration within five minutes. He stated that he was in special education classes while in high school. (R. 990-992).

Plaintiff indicated that he can sit for roughly one-half hour before he becomes uncomfortable and must change position. He stated that bending down to pick up a pencil is excruciating. He noted that he had recently removed a carpet, folded it up,

and threw it out the door and that this activity "caused a lot of pain and agony." He did this chore by himself because he had nobody to help him and for that reason elected to do it alone and deal with the pain. (R. 991). He also testified to occasional numbness in his legs and hands. (R. 993-994).

Plaintiff last worked at a Turkey Hill unloading trucks in 2013. He could not handle the physical demands of the job. Before that he worked at a variety of places through a temporary employment agency doing physical work and, in one case, operating a fork lift between 2008 and 2013. Between 2004 and 2008 he had a number of jobs that he performed for short periods of time before leaving because he was not getting along with people or because he felt mistreated and overworked. He made little money throughout the entire period from 2004 to 2013 but he was able to sustain himself due to an unspecified settlement he received in 2004. (R. 994-998).

Testimony was also provided by Andrew Caparelli, a vocational expert. Mr. Caparelli stated that he had reviewed the Plaintiff's work history from 2002 through 2011. He testified further that Plaintiff's past work activity was either unskilled or semi-skilled and performed at the medium to heavy levels of exertion. The ALJ asked the VE to assume that Plaintiff was capable of working at both light and sedentary occupations with further limitations of: (1) no climbing, balancing, or working

at heights or around hazards; (2) only occasional stooping, crouching, crawling, and kneeling; (3) occasional interaction with coworkers; (4) no interaction with the public; (5) a slow-paced work environment requiring only limited concentration; and (6) a recognition that Plaintiff would be distracted from work tasks for up to 10% of each workday. Based on these assumptions, the VE testified that several jobs would be available to Plaintiff in the "light" category including: assembler of electrical accessories; marker; and conveyer line bakery worker. The VE also testified that sedentary jobs, as limited by the ALJ's hypothetical assumptions, could be performed by Plaintiff including: table worker; label pinker; and carding machine operator. (R. at 1003-1007). When the ALJ added a sit/stand option to the Plaintiff's limitations, the VE stated that, even with that additional limitation, Plaintiff would be able to sustain work as both a table worker and a label pinker. (R. 1008).

Upon questioning by Plaintiff's attorney, the VE acknowledged that if the Plaintiff's attention and concentration would be interfered with on a frequent basis ("frequent" defined as 34% to 66% of the time) he would be unemployable. The VE also stated that if an employee demonstrated an inability to act appropriately with supervisors there would be no tolerance for such an individual in the work place. (R. 1008-1011).

## III. Relevant Medical Evidence.[3]

The only mental health professional whose evaluation of Plaintiff appears in the record is Frank J. DiPrima, a licensed psychologist. Mr. DiPrima saw Plaintiff on at least twenty-six occasions from August of 2014 through March of 2016. These sessions were in connection with the Office of Vocational Rehabilitation's effort to return Plaintiff to the work force after a serious work-related accident in 2008 that resulted in severe physical injuries.

Mr. DiPrima's progress notes of his sessions with Plaintiff (Exhibit 39F, R. 1585-1628) consistently document Plaintiff's intensely angry and resentful affect, extreme negativity, hostility, and self-confessed inability to get along with others. His difficulties interacting with fellow students, faculty, and even cafeteria workers at the community college he attended were documented throughout Mr. DiPrima's notes as well. Plaintiff's penchant for name-calling, use of hostile and accusatory tone of voice, profanity, and judgmentalism were noted by Mr. DiPrima on several occasions. Mr. DiPrima's progress note of his twenty-fifth session with Plaintiff on February 2, 2016 (R. at 1587) indicates that little progress had

---

[3] Because Plaintiff's assignments of error on appeal predominantly relate to his mental/emotional condition, we do not summarize the medical evidence regarding his physical status.

been made in helping Plaintiff gain insight as to how his brusque manner, choice of words, and tone of voice combine to create a "style" that "influences his effectiveness at school, interpersonally, and ultimately in job situations." Mr. DiPrima concluded at this time that Plaintiff "does not appear to be employable in any sustained way, with any reasonable likelihood of success, in any competitive working situation." This theme was echoed after Mr. DiPrima's last session with Plaintiff on March 9, 2016 (R. at 1585) in which Plaintiff was characterized as "minimally receptive to therapeutic input".

On October 28, 2015, after having conducted eighteen counseling session with Plaintiff, Mr. DiPrima executed a "Mental Impairment Questionnaire" with respect to Plaintiff. (R. 1578-1584). Mr. DiPrima noted Plaintiff's "poor response to treatment" and made the following clinical findings: "hyper focused on negative perceptions; suspicious of others to the point of paranoia; explosive outbursts with occasional physical violence; inflexibility in thinking; impaired judgment and reasoning; extreme anger; depression; sleep difficulties; and anhedonia". [4] Mr. DiPrima classified Plaintiff's prognosis as "poor". Among the patient's symptoms identified by Mr. DiPrima

---

[4] Anhedonia is the pervasive loss of interest in virtually all activities. It is a symptom of major depressive disorder. www.psychologytoday.com.

were: impairment in impulse control; mood disturbance; psycho-
motor agitation or retardation; paranoid thinking or
inappropriate suspiciousness; emotional withdrawal or isolation;
intense and unstable interpersonal relationships and impulsive
and damaging behavior; deeply ingrained, maladapted patterns of
behavior; loosening of associations; pathologically
inappropriate hostility; easy distractibility; and oddities of
thought, perception, speech or behavior. Mr. DiPrima also
indicated that, at a minimum, Plaintiff was "seriously limited
but not precluded" in eight mental abilities and aptitudes
needed to do unskilled work. In eight other areas--the ability
to maintain attention for a two hour segment; the ability to
maintain regular attendance and be punctual within customary,
usually strict tolerances; the ability to sustain an ordinary
routine without special supervision; the ability to  work in
coordination with or proximately to others without being unduly
distracted; the ability to complete a normal work week without
interruptions from psychologically based symptoms; the ability
to perform at a consistent pace without an unreasonable number
and length of rest periods; the ability to get along with co-
workers or peers without unduly distracting them or exhibiting
behavioral extremes; and the ability to deal with normal
workplace stress--Mr. DiPrima opined that Plaintiff had "no
useful ability to function". Mr. DiPrima stated further that

"attentional difficulties preclude sustained work/task completion. Angry and explosives behaviors preclude flexible adaption to co-workers and others." Finally, Mr. DiPrima indicated that Plaintiff was not a malingerer and that his identified impairments have lasted or could be expected to last more than twelve months. (R. 1578-1583).

## IV. ALJ Decision.

The ALJ's decision (Doc. 8-14 at 914-945) was unfavorable to the Plaintiff. It includes the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

2. The claimant has not engaged in substantial gainful activity since October 27, 2015, the alleged onset date.

3. The claimant has the following severe impairments: cervical spondylosis, lumbar spondylosis, obesity, bipolar disorder and personality disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the

listed impairments in 20 CFR 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with no climbing, balancing, heights or hazards; occasional stooping, kneeling, crouching and crawling; requires a sit/stand option; SVP reasoning levels of one or two; occasional interaction with coworkers; no interaction with the public; and concentration, persistence and pace limited so that claimant is not distracted more that 10% of the day.

6. The claimant is unable to perform any of his past relevant work.

7. The claimant was born on April 21, 1972 and was thirty-two years old which is defined as a younger individual age 18-44, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material
   to the determination of disability because
   using the Medical-Vocational Rules as a
   framework supports a finding that the claimant
   is "not disabled," whether or not the claimant
   has transferrable job skills.

10. Considering the claimant's age, education,
    work experience, and residual functional
    capacity, there are jobs that exist in
    significant numbers in the national economy
    that the claimant can perform.

11. The claimant has not been under a disability,
    as defined in the Social Security Act, from
    October 27, 2015, through the date of this
    decision.

**V.   Disability Determination Process.**

The Commissioner is required to use a five-step analysis to
determine whether a claimant is disabled.[5]  It is necessary for

---

[5]  "Disability" is defined as the "inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment which can be expected to result
in death or which has lasted or can be expected to last for a continuous period of not less than 12
months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any

*(footnote continued on next page)*

the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

---

other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (Doc. 8-14 at 928-929).

## VI.  Standard of Review.

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla".  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere

> conclusion. *See Cotter*, 642 F.2d at 706
> ("Substantial evidence" can only be
> considered as supporting evidence in
> relationship to all the other evidence in
> the record.") (footnote omitted). The
> search for substantial evidence is thus a
> qualitative exercise without which our
> review of social security disability cases
> ceases to be merely deferential and becomes
> instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp*

*v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in her opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of*

*Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## VII. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further,

the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B. Plaintiff's Allegations of Error**.

**1. Whether the ALJ properly weighed the opinion evidence provided by Plaintiff's treating psychologist?**

The ALJ assigned "no weight" to the opinions of Mr. DiPrima, Plaintiff's treating psychologist, regarding the extent of Plaintiff's mental and emotional limitations and their effect on his employability. (R. at 927). The conclusion that Mr. DiPrima's opinion was assigned "no weight" is somewhat surprising because an acceptable medical source such as a treating psychologist in a long term relationship with a claimant is normally entitled to significant deference. Morales v. Appel, 225 F.3d 310,317 (3d.Cir. 2000). The ALJ did assign "great weight" to Plaintiff's Global Assessment of Functioning Score ("GAF") on one occasion of 60 while simultaneously acknowledging that "a GAF score is limited to the time of assessment and that scores vary from provider to provider." (Id). The ALJ also relied upon the fact that Plaintiff had been able to maintain a 3.18 grade point average at the community college he attends. The ALJ accepted this academic performance

as evidence that Plaintiff is competent to perform various jobs. The ALJ reached this conclusion despite his recognition that Plaintiff receives "accommodation" at his college including additional time to complete his examinations. The significance of Plaintiff's GPA is further eroded by the fact that he was a special education student in high school.

Importantly, the ALJ referenced no medical opinion that contradicted Mr. DiPrima's assessment of Plaintiff's cognitive/emotional limitations and concluded that the various problems Mr. DiPrima identified, including poor impulse control, explosive anger, hostility, depression, suspicion to the point of paranoia, and impaired judgement, were a "life style choice and not a mental health illness." (Id). This remarkable conclusion was made despite the ALJ's previous recognition that Plaintiff's "severe impairments" included bipolar disorder and personality disorder. (R. at 921).

Given the extensive treating relationship between Mr. DiPrima and Plaintiff over a protracted period of time, the lack of any medical evidence in the record to support the ALJ's assessment of Plaintiff's mental/emotional condition, and the ALJ's acknowledgement that Plaintiff's severe impairments include bipolar disorder and personality disorder, the Court must find that the ALJ's assessment of Plaintiff's cognitive/emotional functioning is unsupported by the requisite

substantial evidence. Additionally, the ALJ's musing about "life style choices" is utterly unsupported by any mental health professional's assessment of Plaintiff's mental status and constitutes only the ALJ's lay opinion. Regarding the ALJ's reliance on a GAF score and Plaintiff's college grades, the former reflects only Plaintiff's mental functioning at a brief snapshot in time and the latter constitute scant evidence of Plaintiff's mental/emotional status given the fact that he is being provided special accommodations by the college he attends.[6] For these reasons, this case must be remanded to permit an expansion of the record to include a mental/ emotional consultative examination by a qualified mental health professional.

**2. Whether the ALJ's assessment of Plaintiff's physical capacities is supported by substantial evidence?**

The Court has determined above that the ALJ's RFC assessment of Plaintiff's mental/emotional capacity is not supported by the requisite substantial evidence. Another question lingers. Plaintiff also argues that the RFC assessment of his physical capacity is unsupported by substantial evidence.

---

[6] Plaintiff points out (Doc. 12 at 2) that the latest addition of the Diagnostic and Statistical Manual of Mental Disorders no longer utilizes the GAF scale. These GAF scores are now considered to be of questionable relevance. The government acknowledges the truth of Plaintiff's assertion. (Doc. 11 at 9, n.2).

Plaintiff asserts that the ALJ did not provide an adequate explanation of his assessment of Plaintiff's ability to sit, stand, and walk. (Doc. 10 at 10). Specifically, Plaintiff faults the ALJ for failing to give an estimate by hours of how long he is able to sit, stand, and walk in an eight hour work day. (Id).

SSR 96-8p, cited by Plaintiff to support this argument, does not require the level of specificity that Plaintiff would prefer. The rule does not require a specific delineation of every conceivable ability a claimant must possess to successfully complete a day at work. Rather, as the Government asserts, (Doc. 11 at 16-17), when the ALJ provides "a thorough narrative discussion of Plaintiff's limitations by discussing the objective medical evidence, doctors' notes, Plaintiff's daily living activities, and Plaintiff's subjective complaints", he will have satisfied the requirements of SSR 96-8p. *See Mathis v. Astrue*, 2014 WL 7149465, at *7 (D. Del. December 12, 2014); *Williams v. Astrue*, 2009 WL 482264, at *5 (W.D.Pa. February 25, 2009); and *McCafferty v. Astrue,* 2008 WL 1869282 (E.D. Pa. April 25, 2008). Having reviewed the ALJ's discussion of Plaintiff's physical limitations and the related medical treatment he has undergone (R. 924-927), the Court finds that the ALJ did cite sound reasons for his findings regarding Plaintiff's physical RFC that constitute substantial evidence supporting his decision.

Plaintiff also contends that the ALJ erred by finding that he would be off task only 10% of the workday as a result of his identified severe impairments. However, Plaintiff identifies no evidence that he would be off task more than 10% of the time. Accordingly, mindful of the Plaintiff's obligation to provide specific proof of his limitations, the Court will not, at this point, fault the AJL's estimate. Plaintiff's second assignment of error is thus rejected.[7]

## VIII. Conclusion:

For the reasons provided above, this case will be remanded to the Commissioner of Social Security for an expansion of the record to include a consultative examination by an acceptable medical source directed to ascertaining the degree of Plaintiff's cognitive/emotional impairment and its effect on his residual functional capacity. An Order consistent with this determination will be filed contemporaneously.

**BY THE COURT,**

**S/Richard P. Conaboy**
**Richard P. Conaboy**
**United States District Judge**

**Dated:  September 14, 2018**

---

[7] The Court does recognize that the determination of the degree to which Plaintiff would be off task may be further informed by the consultative examiner's opinion.